Good morning, your honors, and may it please the court. My name is Marshall Bowen, and I represent the City of Austin and the Austin police officers in this case. We're here today on a purely legal question. Are the officers entitled to qualified immunity as to Mr. Buehler's excessive force claim? The answer is yes, because not every reasonable officer would understand that the officer's conduct in this case, as depicted by the video evidence in the record, violated clearly established law on August 2, 2015. You're starting with that as opposed to it did not violate. Are you going to argue both or just clearly established? I'm happy to address both, your honor, but I'd like to begin with the clearly established prong, because that is dispositive in this case. So we'd ask this court to reverse the district court's denial of our motion for summary judgment on Mr. Buehler's excessive force claim and affirm the district court's dismissal of all other claims. So I'd like to begin with the clearly established prong of the qualified immunity analysis as it pertains to Mr. Buehler's excessive force claim. Mr. Buehler failed to carry his burden to demonstrate that the law was clearly established on August 2, 2015, such that every reasonable officer would understand that these officers' conduct was legally impermissible. The Supreme Court has made clear that in order for a right to be clearly established for purposes of qualified immunity, it must be sufficiently clear that every reasonable officer would have understood that what he is doing violates that right. Indeed, this court recently just reaffirmed the notion that this is a heavy burden plaintiff's In the recent case of Harman v. City of Fort Worth, City of Arlington, that's included in our 28J letter, the court explained that plaintiffs must point to a case that is almost squarely on point. And as the Supreme Court has explained, existing precedent must place the question beyond debate. Just a couple weeks ago, in a pair of cases from the United States Supreme Court, City of Tahlequah and Rivas-Villegas, the Supreme Court again cautioned courts to not define the clearly established standard at too high a level of generality. Instead, the contours of the clearly established law must be so well defined that it would put officers on notice that their conduct was constitutionally prescribed. And this is where the district court erred in this case, in concluding that Mr. Buehler carried his burden to demonstrate that the law was clearly established. The cases that the district court relied on in its order and the cases that Mr. Buehler relied on in his brief do not demonstrate that these officers were on notice that their conduct in apprehending Mr. Buehler in the early morning hours on 6th Street in Austin, Texas, violated clearly established law. This court has recently, in Tucker v. City of Shreveport, again addressed the importance of video evidence in a case such as this, even in the posture that we face here on the denial of an officer's motion for summary judgment based on qualified immunity. When video evidence in the record blatantly contradicts a plaintiff's factual allegations, courts must view the record in the light depicted in the video evidence. This comes from Scott v. Harris, the 2007 United States Supreme Court case. And in this case, the video evidence blatantly contradicts Mr. Buehler's claims. Namely, that the video evidence shows that Mr. Buehler was the one who initiated contact with the officers on this night. Mr. Buehler behaved in an increasingly aggressive and combative manner toward the officers throughout the evening. That Mr. Buehler refused to comply with the officers' lawful commands to not interfere with their public duties and to remain at arm's length away from the officers. And that when Mr. Buehler was told he was going to be placed under arrest for interfering with the public duties, Mr. Buehler resisted that arrest. This is plainly depicted in the video evidence in the record. And the district court should have viewed these facts as depicted in the video evidence. I'd like to also discuss how this case fits in the jurisprudential framework of similar cases dealing with qualified immunity and video evidence. As I just touched on, this falls kind of in the line of cases of Scott v. Harris and Tucker v. City of Freeport that was just decided in May of this year. And it differs from those cases where we have a gap in video or the video doesn't provide so much clarity that a court should view the record in the light depicted by the video evidence. And that's a critical distinction in assessing the district court's error here, which is that the facts in this case do not demonstrate that the officers' conduct violated clearly established law. And when we're faced with a case such as this, in which the video evidence blatantly contradicts the plaintiff's statements, we must view that video evidence in the light most, in the light as depicted in the video evidence. I'd also like to address the district court's specific legal error regarding the clearly established prong. Initially, the district court declined to conduct the clearly established analysis, instead deciding that because the district court concluded that the gram factors weigh in Mr. Buehler's favor, it was unnecessary to conduct the clearly established analysis. This was in a footnote. We filed a motion to modify the judgment, and in ruling on that, the district court pointed to the same cases that Mr. Buehler relies on in concluding that the right was clearly established, namely, Goodson, Ramirez, Hanks, and Trammell. And these cases are factually distinguishable from this case, such that these officers cannot be said that they were on notice that their conduct was constitutionally prescribed. Namely, in Goodson, a case that the district court relied on significantly, a 2000 opinion from this case, there was no reasonable suspicion to detain the suspect in Goodson. This court just recently, in Tucker v. City of Carlson, distinguished Goodson on that basis alone. Similarly, in Ramirez, the officer's use of force in that case far exceeded the use of force in this case. They tased the suspect twice, including while the suspect was on the ground. And importantly, this court dismissed Ramirez for want of jurisdiction. And the Supreme Court in City of Tahlequah just a couple weeks ago said, a case in which a court lacks jurisdiction cannot establish clearly established law. Similarly, in Hanks, which was a 2017 case that addressed an arrest in 2013, you had a compliant suspect, but he was met with, quote, an overwhelming amount of force, which included a half-spear punch to his neck. Again, this bears no resemblance to the facts in this case, in which Mr. Buehler was told that he was under arrest after multiple warnings for interfering with the officer's public duties, and when he was told that he was under arrest, he took at least three steps away from the officers and pulled his arm out of Officer Gariby's grasp. This is more than just removing his arm from his grasp. He moved his body away. This is all plainly depicted in the Austin Police Department Halo video. Isn't there a dispute of material fact, a genuine dispute of material fact, as to what Buehler was doing at the time that officers say they perceived that he was trying to resist arrest, and some video would suggest he was trying to hand his favored camera off to some ally? No, Your Honor, I think that there's not a dispute of material fact for two reasons. First, the video evidence plainly shows Mr. Buehler's resistance, his stepping away from the officers as they tell him to turn around, and when he pulls his arm away. And I'll say that whether he was handing his camera off or not is immaterial. The point is, he was not... He wasn't making a run for it, I guess, is where I think the dispute might arise. You have this aerial camera view of what's going on, which may be a better vantage point than the officer had, which would be another sort of fact question, and at least one way to view that, maybe not literally view it, one way to understand that is that he wasn't resisting arrest, he was getting ready to be arrested. Respectfully, Your Honor, the video evidence must be viewed in the light as the officers experienced it at the scene. That's my concern. You need to be saying that it cannot be disputed how the officers were viewed it, and we can't just go by what they say. Right. So you have... It seems to me there's at least some reasonable, I don't know, a possible interpretation of the evidence is he was not trying to escape. He was trying to protect his camera so he could file a lawsuit, perhaps. Right. And so that's not the same thing as resisting arrest. But I think we have to judge it based on how the officers perceived his actions, whether with the benefits... Why isn't that a fact question? Because even if... Because in Griggs, for example, this court looked at the officer's conduct and said, we must view it as they depicted it. And even if there is some... Even if there is some disagreement among officers of whether this conduct was violating clearly established law, these officers are still entitled to qualified immunity. Because every reasonable officer must understand that this conduct was constitutionally prescribed. So at most this case rests in the hazy boundary between acceptable and excessive force. And that's the burden that Mr. Buehler carries, is to demonstrate that the constitutional question is beyond debate. And so whether Mr. Buehler was handing his camera off or not is not a material fact dispute to address the underlying legal question of whether these officers' conduct violated clearly established law on August 2nd, 2015. And so... And so... And importantly on that note as well, it doesn't matter if after the fact you can assess this frame by frame and say, well... And decide whether Mr. Buehler was resisting or not. The question is whether the officers, as they perceived this tense and evolving scene of an individual who had repeatedly refused to comply with their commands throughout the night, had invaded their ability to patrol 6th Street. And they were confronting an environment in which assaults are frequent, in which patrons are often intoxicated in a chaotic scene in the early morning hours. So we have to factor in all of that. And then with that in mind, would every reasonable officer understand that the facts as depicted in this video violated clearly established law? And I think... And so in reaching that conclusion, the district court said that there was a factual dispute that precluded summary judgment. But that was the essence of his legal error, was that in light of these cases, Goodson, Ramirez, Hanks, and Trammell, those cases do not place the constitutional question beyond debate of whether officers on 6th Street early in the morning, faced with a suspect who had made it clear that he was there to harass the officers and continue to refuse to comply with their commands, whether effectuating his arrest by using some degree of force was constitutionally prescribed. And that, in these cases, just do not place that question beyond debate, even construing the facts in the light most favorable to Mr. Buehler. I'd like to also talk briefly about, again, about how we address the video evidence in light of the standard on appeal from a denial of a district court summary judgment based on qualified immunity. As this court is well aware, the procedural posture on the denial of a motion for summary judgment based on qualified immunity is different than a typical appeal from a motion for summary judgment. And it is limited to, as Judge Southwick pointed out, reviewing the materiality of any factual disputes that the district court determined were genuine. But again, as this court has recently found in Tucker v. City of Shreveport, that we must view these facts in the light as depicted by the video evidence. And so even if there are slight disagreements, such as whether Mr. Buehler had his hand under his body during the arrest or not, which is a point that the district court pointed to in denying summary judgment, as this court recently said, it's immaterial whether the video footage does not blatantly contradict all of plaintiff's assertions. The video evidence must merely show that a reasonable officer could believe that the plaintiff was resisting. And that is the essence of where this case lives within the jurisprudential framework. I'd also like to highlight that this case, again, presents an opportunity for this court to address on-the-ground, everyday policing cases that differ significantly from a lot of qualified immunity cases this court confronts. Instead, this case deals with an interaction that is frequent in policing, but is important for this court to decide. And based on the situation, the tense and rapidly evolving situation that these officers faced, unique to this case, it cannot be said that the cases in effect at that time place the question beyond debate. Lastly, I'll just address one other case of Poole, which highlights the fact that the officer's use of force must match and be commensurate with the amount of resistance. And so it's important to note that the amount of force used here was minimal and only the amount of force necessary to subdue Mr. Buehler. Once Explain how the facts of this case are distinguishable from those in Trammell. In Trammell, the court held that a reasonable jury could find that just pulling away, pulling your arm away from officers, didn't justify the officer's decision to kind of take that person to the ground. So explain how this is distinguishable. I think the key facts distinguishing this case is the amount of force used in Trammell. May I finish answering? Is that okay, Judge? Please. That in Trammell, the officers put Trammell in a headlock, they executed a knee strike on Trammell, and then they executed additional knee strikes while Trammell was on the ground. And he lost memory and he said he couldn't breathe. Those facts just don't at all resemble the facts in this case, in which the arrest, based on Mr. Buehler's account, took less than 49 seconds, and Mr. Buehler walked up without any sign of serious injury. So that, the amount of force distinguishes Trammell. All right, Counselor. Thank you. Good morning. Good morning. Daphne Silverman for the plaintiffs. I'm trying a new thing, using the computer this time. As you know, the plaintiff is objecting to their appeal and asking that you reinstate the claims that were dismissed, the false arrest and the retaliation, the First Amendment retaliation claim, the bystander claim, and the Monell claim. What Mr. Buehler and I have been looking for for years is transparency and integrity, and this is what society expects from our police departments. We've seen, instead, from this particular police department, a secrecy and a desire to control any accountability that might happen on the street by photography. As Mr. Buehler says, the officers who have personally harassed him, assaulted, ticketed, arrested him, most have been subsequently observed being abusive toward the public, at least four have been involved in fatal officer shootings, and one became nationally infamous and later fired for a repeat pattern of racism and violence. He points out that this particular arrest is unique in that it cannot be passed off by the actions of some unhinged or crooked cop like some of his other arrests, but this arrest resulted from a deliberately planned attack by a gang of police officers, including supervisors, undeterred by the fact that there was a multitude of people there present. This arrest highlighted for him, and it's part of the severe psychological impact on him, that not only would the department engage in a conspiracy to use policing as a weapon against him, chilling his First Amendment rights, but they would not bother adhering to even their own policies. Your allegation that the police was in a conspiracy or a planned attack? Yes. Well, how do you counter the fact that Buehler was intentionally trying to provoke force that would undermine his argument that the force was unreasonable, and his associate said at the time that was the plan, repeatedly, after Buehler was arrested, was to get him arrested. Yeah. So where's the conspiracy? Well, actually, you can see the conspiracy because if you watch from the Halo video, which I think Judge Southwest mentioned, you can see them form up, walk directly to Mr. Buehler. Deere then says to Mr. Buehler, if you interfere again, if you interfere again, you're going to be arrested. Mr. Buehler doesn't move his feet, hasn't moved his feet once from that location. Sergeant Deere walks away, two other officers close around him, come in close to Buehler again, and Buehler tries to converse with him about what interfering is. They can't give an answer because they're planning on this arrest. They then back up. There's a citizen behind him that says he should back up. He says to that citizen to make sure it's a citizen, are you a cop? You can hear all of this on his audio. And the citizen says no, and he says, well, just leave it be. And then after the horses walk by and you see him talking about the horses leaving their manure, Deere comes back. Deere comes back to him and says, now we're going on patrol, you're interfering, back up. Simultaneously with arguing with Sergeant Deere, Antonio Buehler is complying with the arrest. Never that night, never that night, Judge Clement, did he ever interfere with the police. That is a misunderstanding. Now, that's another thing they've misled you with. Please watch the evidence because they're manipulating you. Mr. Reyes is who they're talking about. Mr. Reyes is talking about the plan by the police. He is not, and he gave an affidavit, it's in the record, he is not talking about any plan to get arrested and have a lawsuit. That is the most absurd thing. We've not made a penny in suing the city of Austin and in confronting the police. Our goal has never been, Mr. Buehler's goal has never been to make money. His goal has been to stand with the people. His goal has been to ensure accountability from a department that he witnessed January 1st, 2012, assaulting someone and got assaulted himself. His goal has been to ensure that type of accountability. We've never made a penny from the city of Austin. By contrast, the city lawyers have made money. Even last week they asked for additional up to $70,000 for this argument. We've never tried to make money and never done anything like that. It's appalling that they used Mr. Reyes's comments that way. Mr. Reyes is on the street videotaping people because an officer killed his dog in front of him and then slammed him to the ground, wrongfully arrested him after the officer had killed his dog. Now, Mr. Buehler, on the other hand, not once has he been found guilty of anything. Not once that night did he interfere. They referenced another incident previously when Lieutenant Hicks is engaged in an interaction with a patron on the street. At that moment, Mr. Buehler videotapes that interaction. Sergeant Deer attempts to interfere with him doing that. Lieutenant Hicks waves off Sergeant Deer. They've mistold the story 100%. And that just gets to what Judge Southwick said. We have a dispute of facts on all of these issues. And the officers have intentionally misled them. Judge Ezra found, as he watched, well actually both district judges who looked at this, because we initially had Judge Ekel on the motion to dismiss, and Judge Ekel found that at the motion to dismiss stage there was sufficient evidence. And Judge Ezra then specifically found that the plaintiff's actions were restricted to filming and asking the officers why that was considered interference. Judge Ezra found that the plaintiff showed no indication of violence or attempting to flee, and Mr. Buehler has never shown any indication of violence or attempting to flee at any point in any time. At the time that he, at the time that Mr. Deer approaches him and says, back up, you're under arrest, I'm sorry, he says back up at first, he backs up, Sergeant Deer is surprised. You can see on his face that he is surprised that Mr. Buehler is backing up. And so he very quickly says, turn around, you're under arrest, because he doesn't want to lose the opportunity from the plan to arrest him. And that's when all he does is reach his arm out to hand the camera off, which actually is part of their policy that they don't seize the cameras of anyone that's on the street, and the policy even specifically says people can videotape. I know that's another issue to address. He never does anything other than reach over and hand that to him. And the affidavit even says that that's what he's doing, he's reaching over and handing the camera. An officer even, you can see, finishes and allows him to turn it, And, of course, Trammell makes it clear, not only from the excessive force standpoint is there not enough, not an appropriate response, but even if you go with some of the case law they're citing, the only thing that they can possibly be talking about is him handing the camera off, which maybe you could say that's similar to pulling your arm away, it doesn't merit any force, and it's clearly a dispute. So on the First Amendment right, which I know you have the Turner opinion in which you found that the First Amendment right to film is not clearly established. Of course, keep in mind that you'll see that language in the complaint because at the time that this happened, it was before Turner, but after Judge Lane's opinion. So you're going to see my language referring to that, but that doesn't discount from the fact that we are alleging traditional First Amendment rights were violated. The petition clause of the First Amendment is one that I cite because of the purpose of gathering, receiving, or recording information to use in a petition to the government for redress of grievances. The free press clause, which is actually what's really disturbing them because they videotape the people that are watching the cops videotape, and then they put it on their website. That press aspect of this is what bothers the police officers the most, the accountability. And the right to be free from retaliation for exercising these rights of publishing and speaking about what they see. I raise all of these issues that aren't new, that have been in place for a long time. I would point out there are several cases that have some photographing, and I think we put them on the brief, Schillingford v. Holmes, which is very similar. They're photographing an incident, a person is photographing an incident on the streets here at Mardi Gras. And in that case, the assault of the policeman was unprovoked. Assault by the policeman was unprovoked and unjustified, is what y'all found. Even though he was photographing, just said that he was merely memorializing what he saw. That's what Antonio is always doing, memorializing what he saw. There's another case in Lowe where there's a search going on, and I've cited this, but there's a search going on and he takes a snapshot and he argues about the search warrant. That's very similar. Antonio is allowing himself to be arrested but arguing about whether he should be arrested and correctly arguing whether he should be arrested. Then on the false arrest issue, of course, if you've not committed any crime, which is what our allegation is, that he's committed no crime, and it's all on video, so you can see that he's committed no crime. I'm not sure how the city attorneys and how the police can watch this and think that he's committed a crime. None of the judges that have watched this so far have found that he committed a crime. Setting that aside, you look at the affidavit and you have your independent intermediary doctrine, which, of course, we'd love to see addressed. I know that this was initially intended when it first came out in the Fifth Circuit to grapple with the fact that an officer is serving a warrant that maybe another officer went to get. Now, that's not the case in this case. They're arresting before they go get the warrant, and they're getting the warrant in order to use this particular doctrine, actually, in order to overcome any civil liability. In this particular case, the other thing they talk about in regards to language that they're saying, I haven't addressed this part, that they're using language calling the officer a pig. This is the only thing, only language, and they're calling that hostile, that they're forgetting about the City of Houston v. Hill opinion, which makes it very clear that the officers have to tolerate that type of language. The First Amendment protects a significant amount of verbal criticism and challenge directed officers. The freedom of individuals to verbally oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation. But looking back at that affidavit, I think it mentions that. I didn't realize that's what they were claiming was the interfering until these attorneys said that's what the officers are claiming. Obviously, that speech can't be interfering. But every single statement that Mr. Gariby makes in that affidavit is actually false, and so it's tainted. Now, Judge Ezra indicates in his opinion he felt we had only raised one of the statements, that is, putting his arm under him, as a false statement. But we actually said in that same paragraph the other part was stepping away. And we explained that he wasn't stepping away from the officers. He was backing up in compliance with the order. Those are the only two things that could be physical interference is his arm and stepping away. And so we are presenting to Judge Ezra and presenting to you that those facts were not true, and those are the only material facts, and certainly they're disputed. If they're not, I probably should have filed a motion for summary judgment on our end, but they're certainly disputed at the very least. And so the other issues that the— So also the independent intermediary doctrine doesn't apply if there's no probable cause, and that's the Malley case, or we think that it shouldn't apply. We're hoping that you'll make a clarification on that. The officers on the street think that the doctrine applies no matter what, regardless of what happens. They believe that the independent intermediary doctrine actually stops, protects them from all liability, and it's causing them to go get warrants and maybe when they wouldn't need to present cases to grand juries. When Malley at the Supreme Court is saying you still have to have probable cause, and in this case there's really no probable cause, or certainly the probable cause is disputed, we're hoping that there'll be some clarification of that doctrine to let the police know that it's not in conflict with Malley, but we do expect probable cause to exist. And with the bystander liability, because we're alleging that this was a plan and because you can see the officers circle around him and stand around, confront him together, it appears clear that all of the officers are participants. In addition, when it happens, they don't stop it from happening. There's no Lt. Hicks at the scene at this time to wave them off and say, no, you can't arrest Antonio Buehler for filming, and so none of the officers step in. That's why we've alleged the bystander liability, and we believe we've alleged it sufficiently. With the Monell claim, Judge Eco had dismissed the city because he analyzed the city training and policies only with regards to excessive force. And I think he got that wrong, too. I think we showed sufficient excessive force. We cited two different cases, Justin Scott and Grady Bolton as prior excessive force cases. Cited those only because I had permission to use their names, but there's a multitude of cases, and that's why Antonio's affidavit supplemented that there were a multitude of cases. Regardless, if there are other claims that survive once the court reviews the facts in this case, such as the false arrest or First Amendment retaliation claims, then this issue, the Monell claim, should be reconsidered in light of all of the available issues to the court at that point  This has been years of confrontation where the city has confronted the people that are trying to videotape them on the street. If they were not worried about their conduct, they wouldn't be worried about the people videotaping. They were advised specifically by the attorney for the National Press and Photographers Association, Mickey Osterreicher, that their policy was unconstitutional because it was too vague and it would cause just these types of arrests. And, in fact, it did continue to cause them. He and Mr. Osterreicher repeatedly corresponded with them. He's provided expert opinions regarding their policy, and it was conveyed directly to them. So this is a case where we actually, the Monell liability on those particular claims is extremely clear and would be very interesting to present to a jury. So we would ask that you return all of these claims to the district court for a jury determination. All right, counsel. We have your argument. Thank you, Your Honor. I'd like to start by addressing Ms. Silverman's claim of an alleged conspiracy in this case. There's simply no evidence in the record that the officers conspired to arrest Mr. Buehler unlawfully or to chill his First Amendment rights. This presents an opportunity to talk about the important distinction between Mr. Buehler's First Amendment retaliation claim and his excessive force claim. Mr. Buehler conflates these issues throughout this case. It's critically important to understand that the officers never told Mr. Buehler he couldn't film them. In fact, to the opposite, they told him that he could. Their specific instructions were related to Mr. Buehler's interference with their ability to patrol 6th Street. And they explained, even though Mr. Buehler was not interested in hearing their explanation, that interference means interfering with their ability to respond to calls, standing too close to their weapons and belts, and obstructing their field of vision. This is all depicted in the video evidence. And that was what Mr. Buehler was arrested for. And that also leads me to address her probable cause arguments regarding false arrest. The independent and intermediary doctrine is well established in this circuit. And the district court properly concluded that the magistrate judge made independent probable cause determinations both for the resisting arrest charge and the interference with public duty charge. So there's nothing, as the district court said in Officer Garaby's affidavit, that stands in stark contrast to the facts as depicted in the video evidence. Also, it's irrelevant what history the officers have with Mr. Buehler or other activity that's not in the record. And Mr. Buehler has frequently included that in his briefing in this case. But that's, again, irrelevant to the question of whether the officers' conduct on August 2, 2015 violated clearly established law based on the situation they faced. And, again, Mr. Buehler also discusses the foul language that he used and that he has a right to use that language. Again, the officers never told Mr. Buehler he couldn't use that language with the officers. Again, they told him that he must remain at arm's length distance and not interfere with their ability to patrol 6th Street. On whether the officers explained what interference was, you can see in the video that Officer Garaby and Officer Deer both take time to explain to Mr. Buehler exactly what type of conduct crosses the line into interfering with public duties. But Mr. Buehler is not interested in hearing their explanation. On the bystander liability claim that Ms. Silverman addressed, there's no bystander liability here because the other officers did not intervene because the arresting officers were not violating a clearly established right. They were simply arresting Mr. Buehler for his interference with their public duties. And there's also an important point to make about the sequence of Officer Deer's final interaction with Mr. Buehler before the arrest. When Mr. Buehler takes the three steps back away from Officer Deer, Officer Deer had already told Mr. Buehler that he was under arrest. And he began signaling with his hand to turn around. And then Mr. Buehler takes the step back. And that's a critical factual point because that is Mr. Buehler's immediate response to Officer Deer's command that he's under arrest. And again, the handing the camera off does not insulate Mr. Buehler from resisting because the question is whether this conduct of the officers based on the situation they confronted, which was Mr. Buehler refusing to consent to the arrest, was what violated clearly established law. And so it was the immediate response to Officer Deer's instruction that he was under arrest that Mr. Buehler took steps back away from Officer Deer. And that sequence is important to the analysis. I'll just briefly address that we do also argue that the gram factors in this case, all three of those apply in the officer's favor. On the first prong of qualified immunity, we talked a lot about the clearly established prong. But that's, again, because that's dispositive in this case. You did get 20 seconds in on whether it constitutes a violation. Congratulations. Thank you. Thanks to you both for helping us understand this case a little better. That concludes the arguments for this panel for this session. We are adjourned.